**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KELLEY A. MCCORMICK,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALLEGHENY VALLEY SCHOOL,** | : | |
| **Defendant.** | : | **No. 06-3332** |

### MEMORANDUM AND ORDER

GENE E.K. PRATTER, J.                                    FEBRUARY 4, 2008

Plaintiff Kelley McCormick commenced this action against her former employer, Allegheny Valley School ("AVS") pursuant to Title VII of the Civil Rights Act 1964, as amended by the Pregnancy Discrimination Act of 1978 ("PDA") and amendments thereto, and the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. ("Title VII"); the Family and Medical Leave Act, 29 U.S.C. §§ 2611, et seq. ("FLMA"); and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 959, et seq. ("PHRA").  Ms. McCormick claims that AVS terminated her employment as a program director (1) based on her sex and pregnancy, (2) in retaliation for engaging in an activity protected by Title VII, and (3) in retaliation for taking FLMA leave.

Both parties now seek summary judgment.  Ms. McCormick asserts that no issues of material fact remain as to her claim; that  she made out a *prima facie* case for each of her claims; and that she presented sufficient undisputed facts to establish that any reasons AVS offered for terminating her employment were mere pretext.  AVS argues that Ms. McCormick failed to

1

establish a *prima facie* case of pregnancy or sex discrimination because AVS did not replace her and did not treat her differently than non-pregnant employees; that Ms. McCormick failed to make out a *prima facie* case of Title VII retaliation because she never engaged in a protected activity; that Ms. McCormick cannot establish a *prima facie* case of FLMA retaliation because she has failed to establish the necessary causal link between taking leave and losing her position with AVS; and that Ms. McCormick presented no evidence that the legitimate, non-discriminatory reasons for AVS terminating her employment were pretext.  For the reasons set forth below, the Court will deny Ms. McCormick's Motion in its entirety and grant AVS's Motion.

## I.    LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment may be granted on if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).   An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law.  Id.

Evaluating a summary judgment motion, the district court "must view the facts in the

light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inference in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. V. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F.Supp. 2d 637, 642 (E.D. Pa. 2004) (restating Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

On cross motions for summary judgment, the same standards and burdens apply.  See, Applemans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987); Peters Township School Dist. v. Hartford Accident and Indemnity Co., 833 F.2d 32, 34 (3d Cir. 1987).  Cross motions for summary judgment

> Are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waived judicial consideration and determination whether genuine issues of material face exist.

Transportes Ferreos de Venezuela II Ca v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968).  Of course, when

presented with cross motions for summary judgment, the Court must consider the motions

separately.  See, Williams v. Philadelphia Housing Authority, 834 F.Supp. 794, 797 (E.D. Pa.

1993), aff'd, 27 F.3d 560 (3d Cir. 1994).


## II.     FACTUAL BACKGROUND

       To describe the background of this case, the Court sets out those facts of record that are

undisputed.  Moreover, they are construed in the light most favorable to the non-moving party.

The Court disregards those factual allegations that the non-moving party makes without any

evidentiary support from the record.  See, Celotex, 477 U.S. at 322-23; Jones v. United Parcel

Service, 214 F.3d 402, 407 (3d Cir. 2000) (requiring more than "unsupported allegations" to

defeat summary judgment).  The following factual recitation separately notes those instances

where Ms. McCormick disputes factual contentions made by AVS, but provides no evidentiary

basis from the record for those disputes, and, in that case, the AVS's factual contentions are

treated as undisputed.  See, Blaylock v. City of Philadelphia, 504 F.3d 405, 413 (3d Cir. 2007)

(citing Anderson) (when the record contradicts a party's description of the facts, it does not

create a genuine dispute).  The Court has accepted as true all other factual contentions made by

Ms. McCormick and construed them in the light most favorable to her.


## A.     Allegheny Valley School's Verree Road Location

       Allegheny Valley School ("AVS") is a non-profit organization that operates residential

and therapeutic programs in Pennsylvania for children and adults with mental retardation.

During the period when Ms. McCormick was employed, AVS operated a residential facility on

Verree Road in Huntington Valley, Pennsylvania.  That facility was a self-contained campus

where special-needs individuals lived and participated in on-site day programs.  The day

programs included activities for recreation, speech therapy, general therapy, and ability

enhancement. (Def.'s Motion for Summary Judgment ("MSJ-D") ¶ 25.)


**B.     Kelley McCormick's Employment History**

  Ms. McCormick has worked in social services for 23 years.  For 18 years she was

employed in entry level direct care positions.  (MSJ-D ¶  3-4.)  After Ms. McCormick received

her college degree in May 2000, she secured a site supervisor position with InterAct.  Id. ¶¶ 5-6.

This position involved management and supervisory responsibilities.  Id. ¶12.  Ms. McCormick

left InterAct to accept a clinical coordinator position at Woodhaven Center of Northwestern

Human Services, and later accepted a program specialist position with Quality Management

Associates ("QMA") where she wrote goal plans and ensured that they were carried out.  Id. ¶ 11.

QMA ended Ms. McCormick's employment at the conclusion of her probationary period.  Id. ¶

13.

  Ms. McCormick applied for the position of Program Director at AVS in

September 2003 after seeing a newspaper advertisement.  (MSJ-D ¶ 23.)  Ms. McCormick was

called in for an interview with Human Resources Manager Helene Bertino and Administrator

Patti Menszak.  Id. ¶ 26.  Ms. Bertino and Ms. Menszak discussed with Ms. McCormick their

concern that she might lack the necessary experience for the position, but they said that Ms.

Menszak could assist her with the transition.  Id. ¶ 28.  Ms. McCormick recognized that the

position entailed more responsibility then her past positions because she would be overseeing a

larger department with a staff of 25-30 people providing more therapies.  Id. ¶¶ 31-32.  AVS

offered Ms. McCormick the Program Director position at a salary of $45,000 per year, and she

began orientation on October 13, 2003.  Id. ¶¶ 34-35.

Monica Hall was a long-time employee of AVS who was supported and reportedly liked

by a majority of the staff.  (MSJ-D ¶ 49.)  Some staff members believed that AVS should have

promoted Ms. Hall to the program director position rather than hiring Ms. McCormick from

outside the organization.  Id. ¶ 48.  AVS management had reservations about Ms. Hall's

qualifications for the promotion and thus sought outside candidates, ultimately choosing Ms.

McCormick.  (Pl.'s Resp. to MSJ-D ¶ 49.)

Early in Ms. McCormick's employment with AVS, she called a staff meeting to address

her concerns about staff members failing to accept her as Program Director.  She felt "negativity"

directed at her from the staff and worried about related rumors.  Ms. McCormick was troubled

that certain employees believed that Monica Hall should have been promoted to the position she

held.  (MSJ-D ¶ 72; Pl.'s Resp. to MSJ-D ¶ 72).

Following Ms. McCormick's new hire probationary period, Ms. Menszak issued a written

performance evaluation.  (Pl.'s Motion for Summary Judgment ("MSJ-P") ¶ 8.)  The April 24,

2004 report indicated that Ms. McCormick was performing well in all areas of work, exercised

"good judgment in dealing with staff issues," and maintained "excellent" overall job

performance.  See, MSJ-P, ex. 14.  Ms. Menszak indicated that Ms. McCormick needed

improvement in only one area: "her moderation of approach."  Id. at 5.  The report listed two

objectives for Ms. McCormick during the following year: (1) taking over as chair of the human

rights committee ("HCC") and (2) administrative training relating to the alternate administrator

6

position.  Id.  Ms. McCormick considered the HCC chair an additional responsibility (MSJ-P ¶ 18), but AVS maintains that Ms. McCormick was told prior being hired that the new program director would hold that position. (Def.'s Resp. to MSJ-P ¶ 18.)

Ms. McCormick learned that she was pregnant in April 2004.  (MSJ-D ¶ 61.)  Her obstetrician informed her that the pregnancy was "high risk."  (MSJ-P ¶ 13.)  Shortly thereafter, Ms. McCormick spoke with Michelle Faggins in the AVS human resources office about how to request leave under FLMA, and she found Ms. Faggins responsive to her questions and concerns. (MSJ-D ¶¶ 63-64.)  At the time, Ms. McCormick felt that other AVS employees were supportive of her pregnancy.  Id. ¶ 68.  When Ms. McCormick asked Ms. Menszak how her pregnancy would affect her employment, Ms. Menszak was "reassuring" and replied, "Women get pregnant. Women have babies."  Id. ¶ 70.  See, id., Ex. 1.

## C.    Escalating Complaints about Ms. McCormick

After the program staff learned of Ms. McCormick's pregnancy, she scheduled a meeting to address rumors about her personal life that she believed were disrupting the program.  (MSJ-D ¶ 73.)  Staff members had been discussing one of the members of the recreation staff, Newlin Brown, who was the father of Ms. McCormick's child.  (MSJ-D ¶¶ 76-77.)  There were rumors that Ms. McCormick left the AVS campus during business hours to spend time with Mr. Brown, and there were views that Ms. McCormick generally favored the recreation staff.  (MSJ-D ¶ 75, 79.)[1]  During the ensuing meeting, Ms. McCormick discussed her personal life and pregnancy in

_____

[1] In their various filings, both parties discuss Ms. McCormick's relationship with Mr. Brown in some depth, but because the relationship had no direct bearing on Ms. McCormick's termination, most of the parties' discussion on that subject is not germane here.  The relationship had only an indirect role in the pending motions insofar as it was a subject of her alleged inappropriate

hopes of alleviating the disruption amongst the staff due to the rumors.  (MSJ-D ¶ 73.)

Ms. McCormick's supervisor, Ms. Menszak, regularly discussed with her areas for improvement.  In particular, Ms. Menszak had become concerned with Ms. McCormick's interactions with other staff members during meetings and her manner of conveying to her staff the changes she wished to implement.  Ms. McCormick admitted being "overly passionate" about changes she wanted to make and needing to alter her approach to co-workers in meetings.  Id. ¶ 86.  Ms. Menszak believed Ms. McCormick was "rough around the edges" when she was hired and continued to need to develop her ability to "moderate" herself even though Ms. McCormick had received a positive performance review in April.  Id. ¶ 88; Pl.'s Resp. MSJ-D ¶ 88.

Ms. McCormick candidly admits that problems staff members persisted.  Throughout 2004, Ms. Hall discussed with Ms. Menszak concerns about Ms. McCormick's behavior at meetings and with staff members.  (MSJ-D ¶ 89.)  During the spring, Ms. Hall received complaints about Ms. McCormick from AVS employees Chimere Williams, Janice Harmon, and Julie Peters.  Id. ¶ 90.

AVS asserts that Ms. Hall approached Ms. Menszak in late October or early November 2004 because an increasing number of staff members were complaining about Ms. McCormick.  Id. ¶ 91.2   During the same period both Julie Peters and Mary Tate complained to Ms. Menszak about Ms. McCormick's management style.  Id. ¶ 92-93.  AVS asserts that Ms. Menszak spoke privately with Ms. McCormick about concerns arising from these complaints.  Id. ¶ 91.  Ms.

_____

communications with staff members.

[2]Ms. McCormick denies this allegation, but offers no evidence supporting her alleged knowledge of a conversation between Ms. Hall and Ms. Menszak.  See, Pl.'s Resp. MSJ-D ¶ 91.

McCormick denies that anyone spoke with her about alleged problems at that time.  Pl's Answer to MSJ-D ¶ 91.

In October 2004 Janice Harmon, who had worked at AVS since January 1996, resigned. During a written exit interview, Ms. Harmon praised Ms. Hall, but rated Ms. McCormick a two out of ten.  Id. ¶ 94.  See, MSJ-D, Ex. 11.  Ms. Harmon stated that Ms. McCormick was unprofessional and spent company time doing personal tasks with favorite staff members.  Ms. Harmon also complained that Ms. McCormick inappropriately disciplined her.  Id. ¶ 95.

Several AVS management-level employees complained about Ms. McCormick's general demeanor with staff members and her unprofessional approach in meetings, which Ms. McCormick admits in her Response. For example, Carston Warner, a management-level employee, spoke with both Ms. Bertino and Ms. Menszak about problems he had with Ms. McCormick.  Mr. Warner said he could not work on a team with Ms. McCormick, and he reported that his supervisees regularly expressed concerns about her abrupt and rude behavior.   He also said that he could not effectively communicate with Ms. McCormick and therefore tried to avoid her.  Id. ¶ 97-98.  Jeff Shin, another management-level employee, said that his staff had problematic interactions with Ms. McCormick when developing and implementing goal plans for residents.  Id. ¶ 100.

When another employee, Chimere Williams, resigned in October 2004, she cited Ms. McCormick as the reason.  Ms. Williams stated in her exit interview that while Ms. Hall was a pleasant manager, Ms. McCormick was unprofessional and had a "nasty attitude in response to questions."  Id. ¶¶ 102-103.  Ms. Williams told Ms. Bertino that she would have remained at AVS but for her problems with Ms. McCormick. Id. ¶ 103.  Ms. McCormick asserts that Ms. Menszak

assured her that the negative interview was not something to concern herself over because departing employees often make negative comments about their supervisors.  Pl.'s Resp. MSJ-D ¶ 102.

On October 29, 2004, AVS approved up to 12 weeks of unpaid leave for Ms. McCormick under FLMA for the birth and care of her child.  The leave was scheduled to commence December 20, 2004.  <u>See</u>, MSJ-P, Ex. 40.

**D.      Disciplinary Meeting with Ms. McCormick, November 11, 2004**

As a result of the negative exit reviews, escalating complaints, and negative feedback about inappropriate meetings called by Ms. McCormick, Ms. Menszak and Ms. Bertino considered terminating Ms. McCormick's employment.  (MSJ-D ¶ 105.)  The managers decided not to terminate her at that time because she was near the end of a high-risk pregnancy.  They instead prepared a written warning letter detailing performance issues.  <u>Id.</u>  The letter specified employee complaints and instances of unprofessional behavior, including meetings to address personal issues, violations of the organization's confidentiality policy, and staff complaints about Ms. McCormick's behavior.  <u>See</u>, MSJ-D ex. 18.

Ms. McCormick received the warning letter during a November 11, 2004 disciplinary meeting with Ms. Menszak and Ms. Bertino.  She acknowledged the letter by signing below a line that stated: "I understand that my signature only indicates that I have received this warning and not that I necessarily agree with it."  (MSJ-D ¶ 106.)   AVS maintains that Ms. Menszak told Ms. McCormick that the infractions outlined in the letter were dischargeable offenses (MSJ-D ¶ 110), but Ms. McCormick denies this.  Pl.'s Resp. MSJ-D ¶ 110.

**E.      New Employee Training Meeting December 16, 2004**

Just before her FLMA leave was to commence, Ms. McCormick conducted a formal

training session for two new hires, Barbara Moiyallah and Warren Givens, on December 16, 2004.

(MSJ-D ¶¶ 112-113.)   Numerous people interrupted the training session, but Ms. McCormick did

not indicate to her staff that she was training new employees and should not be interrupted at that

time.  Id. ¶¶118, 120.   Ms. McCormick now candidly admits this fact.   Pl.'s Resp. MSJ-D ¶¶ 118,

120.   The visitors gave Ms. McCormick baby gifts and asked personal questions about her

pregnancy and the child's upcoming birth.   (MSJ-P ¶ 38.)

Mr. Givens testified in his deposition that during the training session, Ms. McCormick

discussed the father of her child.   Mr. Givens said that Ms. McCormick told him and Ms.

Moiyallah that she was impregnated by a person who once worked at AVS, that she did not like

the man who impregnated her and wished it had been another man, and that she was uncertain

how she was going to tell her family that the father of her child an African American.   (MSJ-D ¶¶

124, 127.)   Mr. Givens testified that he had not asked about Ms. McCormick's pregnancy and

thought her comments were highly inappropriate.   Id. ¶ 126, 130.   He said that none of the people

who brought Ms. McCormick gifts had asked questions about her pregnancy or her baby's

paternity, gender, or name.   Id. ¶ 129.

Ms. McCormick disputes Mr. Givens' account.   She claims that the people who

interrupted the training session did ask her personal questions, but that she did not spontaneously

offer any personal information to Mr. Givens.   (Pl.'s Answer to MSJ-D ¶ 120.)   She denies

discussing her child's father with Mr. Givens or Ms. Moiyallah.   Id.  ¶ 124.

11

Ms. McCormick commenced her FMLA leave on December 18, 2004.  Id. ¶ 136.

**F.      Reports and Discussions Following the Training Session**

After the training session, Mr. Givens and Ms. Moiyallah talked about their discomfort resulting from Ms. McCormick's discussion of her personal life, something Ms. McCormick readily admits.  (MSJ-D ¶ 132.)  Mr. Givens prepared a written statement on December 22, 2004 describing the session.  In the statement, he wrote his view that some of Ms. McCormick's statements during the session were inappropriate.  He also stated that he simply wanted to do his job, not hear about people's personal lives.  Id. ¶ 139.

Mr. Givens met with Ms. Bertino to discuss his statement.  During the meeting, he said that he and Ms. Moiyallah, the other new hire, were the only people present when Ms. McCormick made the statements about her child's father.  (MSJ-D ¶ 142.)  Based on this information, Ms. Bertino met with Ms. Moiyallah, who confirmed that she had witnessed inappropriate and unprofessional behavior by Ms. McCormick during the training session.  Id. ¶ 143-144.  Ms. Bertino asked Ms. Moiyallah to prepare a statement regarding the training session. Id. ¶ 144.

Ms. Moiyallah's statement from February 4, 2005 described staff members interrupting the training session, Ms. McCormick sharing intimate details about her personal situation, and Ms. McCormick crying.  Id. ¶ 145.  Ms. Moiyallah described the situation as "extremely uncomfortable."  Id.

Ms. Bertino and Ms. Menszak believed that Mr. Givens' and Ms. Moiyallah's complaints were credible because they were new employees without any history with Ms. McCormick – and

12

thus without any reason to fabricate stories.  Id. ¶ 146.  Ms. Menszak discussed with Mr. Ulinski, regional director; Ms. Bertino, human resources manager; and Richard Rizzutto, director of human resources, her concerns about Ms. McCormick's behavior.  Id. ¶ 147.  She  likened Ms. McCormick's behavior during the training session to the behavior leading up to her disciplinary meeting November 11, 2004.  Id. ¶ 146.  Ms. Menszak recommended that Ms. McCormick be terminated, and the other AVS managers agreed.  Id. ¶ 148.  Ms. Menszak believed that Ms. McCormick had a duty to act professionally and that during the December training session Ms. McCormick should have ensured that focus remained on the training, not on herself.  Id.  ¶ 152.

Mr. Rizzutto agreed with Ms. Menszak's assessment of the situation given that Ms. McCormick had previously engaged in unprofessional behavior and had been warned that AVS would not tolerate such actions.  Id. ¶ 156.  Mr. Rizzutto believed that Ms. McCormick's past good performance was irrelevant to the termination decision because in November she was warned not to engage in unprofessional conduct, but subsequently in December she did just that.  Id. ¶ 157.

Ms. Menszak, Ms. Bertino, and Mr. Ulinski called Ms. McCormick at her home on Sunday, February 20, 2005, the day before she was to return to work.  Id. ¶ 164.  Ms. Menszak explained to Ms. McCormick the complaints that she had received, and Ms. Bertino read to her the related witness statements.  Id. ¶ 166.

**G.      Events at AVS Following Ms. McCormick's Termination**

After AVS terminated Ms. McCormick's employment, the organization did not hire a replacement at the Verree Road location.  Instead, Ms. Menszak resumed the program director duties.  Id. ¶ 174.  In December 2005, AVS hired Nancy Cannally as program director for another

AVS location, Tremont Avenue.  Id. ¶ 175-177.  Ms. Hall was promoted to program director in

November 2006, and she now oversees two locations: Verree Road and Tremont Avenue. (Pl.'s

Answer to MSJ-D ¶¶ 174 & 176.)  AVS no longer has a full day program at the Verree Road

location. (MSJ-D ¶ 178.)


## III. DISCUSSION

### A.      Sex and Pregnancy Discrimination under Title VII, as Amended by the Pregnancy Discrimination Act

Ms. McCormick argues that Allegheny Valley School's decision to terminate her

employment constituted sex and pregnancy discrimination in violation of Title VII of the Civil

Rights Act of 1964[3] and the Pregnancy Discrimination Act ("PDA"), which prohibits

discrimination on the basis of "pregnancy, childbirth, or related medical conditions."

The Court applies the burden-shifting analysis developed in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973). Thus, Ms. McCormick must first establish a *prima facie* case of

discrimination by a preponderance of the evidence, Texas Dept. Of Community Affairs v. Burdine,

450 U.S. 248, 252-253 (1981), which merely requires that she "present sufficient evidence to allow

a fact finder to conclude that the employer is treating some people less favorably than others based

on a trait that is protected under Title VII [of the Civil Rights Act of 1964]." Iadimarco v. Runyon,

190 F.3d 151, 161 (3d Cir. 1999).  "The evidentiary burden at this stage is rather modest: it is to

demonstrate to the court that [P]laintiff's factual scenario is compatible with discriminatory

intent-i.e., that discrimination *could* be a reason for the employer's action."  Coulton v. University

---

[3] Claims under the PHRA may be treated coextensively with Title VII claims.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

of Pennsylvania, 2006 WL 759701, at *5 (E.D. Pa. Mar. 21, 2006) (quoting Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir.1996) (emphasis in original)).

If Ms. McCormick meets her burden to present a *prima facie* case, the burden shifts to Allegheny Valley School to articulate some legitimate, nondiscriminatory reason for its actions. Burdine, 450 U.S. at 252-253.  Once the employer offers some evidence of a legitimate, non-discriminatory reason for its actions, to defeat summary judgment, the plaintiff employee must then show that the stated reason was in fact pretext by pointing to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Iadimarco,190 F.3d at 166 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  The ultimate burden of persuading the trier of fact that Allegheny Valley School intentionally discriminated against Ms. McCormick is at all times her burden.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-507 (1993).


i.      **Ms. McCormick's *Prima Facie* Case of Sex and Pregnancy Discrimination**

To establish a *prima facie* case of sex and pregnancy discrimination, Ms. McCormick must show that: (1) she is a member of a protected class, (2) she was qualified for the position, and (3) she was subject to an adverse employment action, (4) under circumstances that give rise to an inference of discrimination.  Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 95 (3d Cir. 2005) (citing Goosby v. Johnson & Johnson Med. Inc., 228 F.3d 313, 318-19 (3d Cir. 2000)).  To establish a claim of pregnancy discrimination, a plaintiff must demonstrate that "she was treated

less favorably than a nonpregnant employee under identical circumstances and that her pregnancy was the reason she was treated less favorably."  Jones v. Hospital of University of Pennsylvania, 2004 U.S. Dist. LEXIS 15711 *9 (E.D. Pa. 2004).

       **a.**       **Ms. McCormick was a Member of a Protected Class**

AVS argues that Ms. McCormick was not a member of a protected class under Title VII and the PDA because she was no longer pregnant when she was terminated in February 2005, two months after she gave birth.  Although Ms. McCormick makes no reference to any related case law, Jones v. Hospital of the University of Pennsylvania, 2004 U.S. Dist. LEXIS 15711 (E.D. Pa. 2004), runs counter to AVS's argument.  In Jones, the plaintiff had given birth two and one half months prior to her termination, but the court found "sufficient temporal proximity to her pregnancy to fall within the protected class of the PDA."  Id. at *14.  In Jones, the court observed that "some effects of pregnancy linger beyond the act of giving birth," thus entitling a woman to legal protections beyond the day of her child's birth.  Id. at *13.  This Court agrees with the Jones analysis on this point and concludes that Ms. McCormick satisfies the first prong of the test because she was terminated approximately two months after giving birth,[4] within a time frame protected under the PDA and, thus, Title VII.

       **b.**       **Ms. McCormick was Qualified for the Position with AVS**

Ms. McCormick must show that she was qualified for her position with AVS; however,

---

[4]The Court also notes that the activities by which AVS began its gathering of critical and negative information about Ms. McCormick occurred at a time when Ms. McCormick was pregnant and, indeed, was getting ready to begin her FLMA maternity leave.

the standard for such a showing at the summary judgment stage is decidedly "not onerous."  Texas Department of Community Affairrs v. Burdine, 450 U.S. 248, 253 (1981).   Ms. McCormick had many years of experience in social services and a related college degree.  Therefore, she was qualified for her position for purposes of the *prima facie* test.

### c.   Ms. McCormick Suffered an Adverse Employment Action

It is undisputed that Ms. McCormick was terminated from her position with AVS. Therefore, she can establish the third prong of her *prima facie* case of sex and pregnancy discrimination under Title VII, namely, that she experienced an adverse employment action.

### d.   The Circumstances Surrounding Ms. McCormick's Termination Give Rise to an Inference of Discrimination

While the elements of a *prima facie* case may vary depending on the facts and context of the individual situation, "[c]ommon circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class."  Wooler v. Citizens Bank, 2006 U.S. Dist. LEXIS 86606 *16 (E.D. Pa. 2006).

AVS argues that the circumstances surrounding Ms. McCormick's termination do not give rise to an inference of discrimination because (1) Ms. McCormick was not replaced as program director of the Verree Road facility and (2) she failed to present evidence that any co-worker outside her protected class received more favorable treatment.

Ms. McCormick maintains that the circumstances surrounding her termination provide

ample evidence of discrimination.  While AVS did not hire a new program director specifically at the Verree Road facility, the organization replaced Ms. McCormick with a non-pregnant employee based at another location.  In addition, Ms. McCormick argues that many non-pregnant AVS employees with more significant disciplinary infractions were not terminated.

### 1.      Hiring Someone Not in the Protected Class

As explained, AVS maintains that Ms. McCormick was not replaced as program director of the organization's Verree Road facility.  Ms. Menszak temporarily reassumed program director duties following Ms. McCormick's termination, but AVS never hired a permanent replacement. Indeed, AVS phased out its Verree Road day program when it opened a new facility at Tremont Avenue, so there was no longer a program director at the Verree Road facility.  There is no evidence to suggest that AVS had reached the decision to close the Verree Road location prior to discharging Ms. McCormick.  Likewise, there is no suggestion that Ms. McCormick's discharge was a result of a company decision to reduce its forces.

AVS acknowledges that it hired Nancy Cannally as program director of the Tremont Avenue facility, and in November 2006, promoted Ms. Hall to that position.  (Def.'s Resp. MSJ-P at 7.)  Ms. Hall has twice taken FLMA leave while employed by AVS (though never for pregnancy), so AVS argues that the person who holds the program director position at this time is within the same protected class as Ms. McCormick, namely, a woman who has taken FLMA leave.  Id. at 8.

Ms. McCormick asserts that she was replaced by a succession of employees not within her

18

protected class – women who had not taken FLMA maternity leave during the period she took leave.  Ms. McCormick argues that while AVS did not specifically hire someone to assume the program director position at the Verree Road location, Ms. Menszak reassumed program director duties, thus effectively replacing Ms. McCormick.5  Ms. McCormick emphasizes that AVS hired Nancy Cannally for a nearly identical program director position at another AVS location and later promoted Ms. Hall, Ms. McCormick's former subordinate at the Verree Road program, to be program director at the new site.  See, Pl.'s Reply SJM-P at 4-5.

Ms. McCormick also argues that changing the physical location of a job does not equate to changing duties and responsibilities.  Because the program director retained the same responsibilities, says Ms. McCormick, the Court should consider Ms. Menszak, Ms. Cannally and Ms. Hall replacements for Ms. McCormick.  Within the context of a motion for summary judgment, Ms. McCormick has established a factual record presenting sufficient evidence to support an inference that AVS replaced her with two individuals outside her protected class, namely, Ms. Cannally and Ms. Hall.

### 2.    More Favorable Treatment of Similarly Situated Colleagues Outside the Relevant Class

Ms. McCormick maintains that several similarly situated AVS employees outside her protected class were treated more favorably than she.  She details numerous employees'

---

5The Court finds that Ms. Menszak is within the same protected class as Ms. McCormick.  Ms. Menszak is a female employee who has taken FLMA pregnancy/maternity leave while employed by AVS.  Although she did not take this leave during the exact time period in which Ms. McCormick took FLMA pregnancy leave, the similarity of her overall position renders Ms. Menszak someone within the same protected class.

disciplinary histories as proof.  However, AVS maintains that these other employees committed

less severe disciplinary infractions and thus cannot be compared with Ms. McCormick for the

purposes of this litigation.  In addition, at least one of the employees was Ms. McCormick's

subordinate and thus not similarly situated.

In order to establish the fourth prong of a *prima facie* case of discrimination, Ms.

McCormick must identify male or non-pregnant female comparators who were treated differently

by AVS.  Under Title VII, for fellow employees to be considered similarly situated, they must

"have engaged in the same conduct without such differentiating or mitigating circumstances that

would distinguish their conduct or the employer's treatment of them for it."  Anderson v.

Haverford College, 868 F.Supp. 741, 745 (E.D. Pa. 1994) (citations omitted).  See also, Jones,

supra.

Ms. McCormick argues that several employees outside her protected class were treated

more favorably.[6]  In particular, she identifies the following AVS staff members:

1) **Monica Hall** had received 14 disciplines regarding poor work performance, failure to

meet responsibilities, failure to complete plans, and other problems prior to her promotion

in November 2006.  (MSJ-P ¶ 62.)

2) **Jeff Shinn**, supervisor of special services, was the subject of complaints in an employee

---

[6]In addition to the employees mentioned here, Ms. McCormick listed a number of employees
who AVS disciplined repeatedly without terminating their employment.  See, MSJ-P  ¶ 86.
However, AVS notes that none of the listed individuals held director level management
positions, and most were not managerial employees at all.  (Def's Resp. to MSJ-P ¶ 86); (Def's
Reply in Support of MSJ-D at 9.)  See, Mack v. Strauss, 134 F.Supp.2d 103, 114 (noting that
subordinates are not similarly situated to the plaintiff).  AVS also asserts that at least five of the
listed employees took FLMA leave during their employment with AVS and thus are within the
same protected class as Ms. McCormick.  (Def's Resp. to MSJ-P ¶ 86); (Def.'s Reply in Support
of MSJ-D at 9.)

exit interview because of his management style and received a written disciplinary warning after allegedly making inappropriate sexual comments to female staff members.[7] He was not terminated.   (MSJ-P ¶ 59.)  See, Id., Ex. 9 at 246-249.

3) **Jennifer Szopo**, eastern region acting director, received oral counseling from her supervisor regarding her management style and attended anger management training. (MSJ-P ¶ 60.)

4) **Carston Warner**, director of residential services, received 10 disciplines (including six between May and December 2005) for poor job performance prior to his resignation in January 2006.  (MSJ-P ¶ 64.)

AVS identifies concrete evidence in the record disputing Ms. McCormick's bald characterization that similarly situated employees were treated differently than she was treated. First, according to AVS, Ms. McCormick's discussion about Ms. Hall's performance is irrelevant because Ms. Hall was a subordinate, not a similarly situated employee.  (Def.'s Resp. MSJ-P ¶ 57.)  See, Mack v. Strauss, 134 F. Supp.2d 103, 114 (D.D.C. 2001) ("The five staff members in plaintiff's group are not similarly situated because they are plaintiff's subordinates, and by definition, they do not deal with the same supervisor and are not subject to the same standards as plaintiff.")  In addition, AVS asserts that Ms. Hall had received "Notes to Employee File," not official discipline.  According to AVS, such notes provide AVS a means of recording discussions with employees, but are not considered internal discipline.  Id. ¶ 62.

---

[7]AVS found one complaint against Mr. Shinn credible: his use of the word "cankles" to refer to certain women's ankles.  He was disciplined for this comment and warned that such behavior violated AVS policy.   (Def.'s Resp. MSJ-P ¶ 67.)

Second, Mr. Shin received one complaint from an employee's exit interview and one warning about unprofessional behavior.  Id. ¶¶ 59 & 68.  AVS points out that unlike Ms. McCormick, who was the subject of two negative exit interviews, received a written warning, then was accused of engaging in additional subsequent unprofessional behavior, Mr. Shin need no further discipline after receiving his initial warning.  Id. ¶ 68.  See, Pittman v. Continental Airlines, Inc., 35 F.Supp.2d 434, 443 (E.D. Pa. 1999) ("[A] female sexual discrimination plaintiff must show that male employees did not suffer similar adverse employment actions, despite displaying the *same* problem with provoked and supported the adverse action suffered by the plaintiff.") (emphasis added).  Also, Mr. Shin received his written warning *two years after* Ms. McCormick was terminated, so his situation was not sufficiently contemporaneous with Ms. McCormick's to make his situation analogous for purposes of this litigation.  Id.  See, Dill v. Runyan, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. 1997) ("[P]roposed analogues must be similarly situated in all 'material aspects.'"); Gaul v. Zel Manuacturing Co., 2004 U.S. Dist. LEXIS 1990, at *5 (E.D. Pa. 2004) (limiting temporal scope of discovery to a reasonable time "predating the liability period of a Title VII lawsuit") (emphasis added).

Third, AVS denies that Ms. Szopo received training in anger management.  Ms. Szopo testified in deposition that she attended a general communications training after discussions with management.  Id. ¶ 60.  Additionally, even if Ms. Szopo was disciplined once, a single incident does not make her situation analogous to Ms. McCormick in all material aspects.  See, Dill, 1997 U.S. Dist. LEXIS 4355, at *12.

Finally, AVS states that Mr. Warner was employed by AVS for more than 20 years, from February 1985 until January 2006, while Ms. McCormick was employed by AVS for less than a

year and a half.  Any discrepancy between the overall number of disciplinary actions taken against these two employees is explained by the significant difference in the length of their tenures with organization.  AVS also argues that Mr. Warner received official discipline only three times during his entire employment with AVS; the other items cited by Ms. McCormick are notes in his employee file.  AVS denies that Mr. Warner received six disciplines or even six notes between May and December 2005.  According to AVS records, only one disciplinary action, a letter of concern, was presented to Mr. Warner between May 15, *2003* and December 6, 2005, the time period in which Ms. McCormick received her disciplinary letter and then conducted the training session which led to the termination of her employment.  Id. ¶ 64.  Like the other alleged comparators, Mr. Warner's situation is not analogous in all material aspects.

AVS likens Ms. McCormick's situation to that of the plaintiff in Jones, supra., a pregnancy discrimination case.  There, the plaintiff was terminated after her employer received a report that she was sleeping on the job during a suicide watch.  The plaintiff identified two other employees who also were caught sleeping during working hours, but those employees were not sleeping during suicide watches, and for that reason the court found that they were not legitimate comparators, granting summary judgment for the employer.  Id. at *23.

The Court concludes after closely considering each of the persons proposed by Ms. McCormick that she has failed to identify any viable comparator outside her protected class who received more favorable treatment than she received.  However, Ms. McCormick may satisfy the forth prong of her *prima facie* case of discrimination by establishing a factual record presenting sufficient evidence to support an inference of discrimination by showing *either* that AVS hired someone outside her protected class *or* that a similarly situated colleague outside her protected

23

class received more favorable treatment.  Because the factual record supports the inference that

AVS replaced Ms. McCormick with two individuals outside her protected class, so Ms.

McCormick has established a *prima facie* case of discrimination.

### ii.     Allegheny Valley School Proffers Non-Discriminatory Reasons for its Actions

AVS contends that the organization terminated Ms. McCormick's employment due to a

number of significant disciplinary infractions, including discussing personal problems during staff

meetings, failing to moderate her management approach after discussions with and admonitions

by her supervisors, and having inappropriate, personal discussions with new hires during a

training session.  AVS has submitted testimonial and documentary evidence to support its

contention that Ms. McCormick's employment was terminated due to repeated disciplinary

infractions, including those committed after receiving a specific warning about her past behavior.

The Third Circuit Court of Appeals has defined as "relatively light" an employer's burden

to proffer legitimate, non-discriminatory reasons for adverse employment actions.  <u>Fuentes</u>, 32

F.3d at 763.  Although Ms. McCormick has successfully articulated a minimum *prima facie* case

of sex and pregnancy discrimination, AVS also has proffered sufficient evidence to meet its

burden of production.  Therefore, the Court now turns to the issue of pretext.

### iii.    Allegheny Valley School's Articulated Reasons for Ms. McCormick's Termination Are Not Mere Pretext

In order to survive summary judgment for the employer,  a plaintiff must "present

evidence contradicting the core facts put forward by the employer as the legitimate reason for its

decision."  <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005).  A plaintiff must

demonstrate "such weakness, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Fuentes, 32 F.3d at 765 (citations omitted). To demonstrate that an employer's proffered reasons were pretextual, "however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. Indeed, the Court must consider only "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005). Accordingly, the plaintiff's burden to cast doubt on an employer's stated reasons for an employment decision is characterized in this circuit as a "difficult" one. Fuentes, 32 F.3d at 765.

Ms. McCormick argues that her six-month performance review is relevant in determining whether AVS's stated reasons for the written warning issued to her in November 2004 were pretextual. Ms. McCormick maintains that the written warning refers to events that took place prior to the issuance of her evaluations, but which were not mentioned in the positive performance review. (Pl.'s Surreply to MSJ-D at 5.) She questions why Ms. Menszak would appoint her to chair the HRC and to lead committee meetings if Ms. Menszak indeed had concerns about her conduct in staff meetings. Id.

AVS argues that the earlier April 2004 performance review cannot provide evidence of pretext. Indeed, presented to the Court in these cross-motions, the evidence is that staff members did not begin complaining about Ms. McCormick until some considerable time after that review

25

was issued.  The two exit interviews that allegedly provided the impetus for management to

prepare Ms. McCormick's warning letter were not conducted until September 2004.  The new hire

training session that AVS claims ultimately forced management to terminate Ms. McCormick did

not occur until December 2004.  Therefore, according to AVS, the April 2004 performance review

has no bearing on whether the post-evaluation misconduct cited by AVS is a mere pretext for a

discriminatory termination.  (MSJ-D at 30-31.)

In Kautz, 412 F.3d at 474, the Court of Appeals affirmed summary judgment for an

employer even though the plaintiff had pointed to a record of positive performance reviews during

his employment to show pretext.  According to the court,  "[t]he attempt to use past positive

performance reviews to show that more recent criticism was pretextual fails as a matter of law."

Id. at 474 (citing Ezold v. Wolf, Block, Schorr, Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992)

("Pretext is not established by virtue of the fact that an employee has received some favorable

comments in some categories or has, in the past, received some good evaluations.")).  Therefore,

Ms. McCormick must direct the Court's attention to other evidence.

To bolster her assertions of pretext, Ms. McCormick discusses the experiences of another

former AVS employee who did not return to work there following her FLMA maternity leave.

Karen Quinn worked at AVS as a human resources coordinator until August 2004 when she began

approved FLMA maternity leave.  (MSJ-P  ¶¶ 88, 91.)   Prior to and during her leave, Ms. Quinn

discussed with Ms. Bertino the possibility of returning to AVS as a part-time employee, but she

(Ms. Quinn) was not given a part time position after the end of her FLMA leave period.  Id.  ¶¶

92-93.  Ms. McCormick asserts that while AVS labeled Ms. Quinn's separation as a "voluntary

resignation," in fact, AVS effectively terminated her by failing to accommodate her desire to

return part-time.  Id.  ¶ 99.

AVS disputes Ms. McCormick's depiction of Ms. Quinn's employment situation.  AVS quotes Ms. Quinn's deposition testimony to support its position that Ms. Quinn knew that she could return to her full-time position after her leave ended.  MSJ-P, Ex. 11 (Quinn Depo. at 309) ("Because it would have been my choice, if I wanted my full-time job back, I could have had it."). Ms. Quinn also testified that her husband wanted her to stay home to care for their child and that she was not ready to return to work after the end of her FLMA leave.  Id. at 76, lines 11-17; 77, lines 11-13.  In fact, AVS offered Ms. Quinn a different full-time position with greater pay prior to her resignation, but Ms. Quinn declined because she was not prepared to leave her child.  Id. at 227, lines 19-20; 245, lines 7-24; 246, lines 1-5.

Although Ms. McCormick attempts to liken Ms. Quinn's situation to her own to demonstrate pretext, even when viewed in the light most favorable to Ms. McCormick, the record does not support such comparison.  As stated above, Ms. Quinn testified that she could have returned to her full-time position with AVS, but chose to stay at home with her child.  Ms. Quinn expressed frustration with her inability to find out the exact details about any part-time position she might have taken after her leave, but she never testified that part-time work was unavailable prior to her official resignation.  While Ms. Quinn's testimony does express a degree of confusion about how discussions with AVS management were conducted, it certainly does not support Ms. McCormick's allegation that Ms. Quinn was terminated at the end of her FLMA leave.  Therefore, discussion of Ms. Quinn's situation has no bearing on Ms. McCormick's allegations of pretext in her own case.

Arguing against there being any hidden reason for firing Ms. McCormick, AVS reiterates

27

the problems that occurred during Ms. McCormick's employment.  AVS cites the two exit interviews conducted with long-term employees who resigned due to problems with Ms. McCormick, general complaints about Ms. McCormick's management style, and the complaints about the new employee training session held the day before Ms. McCormick began her leave. (MSJ-D at 14-16.)  AVS notes that "these various individuals who complained about Plaintiff were either her subordinates or her co-workers, and there is not a shred of evidence that any of these individuals harbored any discriminatory animus toward Plaintiff based on her sex or pregnancy." Id. at 16.

AVS acknowledges that Ms. McCormick denies the allegations made by Mr. Givens and Ms. Moiyallah regarding the new employee training session.  However, the organization notes that the truthfulness of those complaints is irrelevant so long as AVS honestly relied on them in making its decision to terminate Ms. McCormick. Id. at 19.  The Third Circuit Court of Appeals has made it clear that it "will not second guess the method an employer uses to evaluate its employees." Kautz, 412 F.3d at 468.

Although Ms. McCormick may not believe that AVS should have terminated her because of negative employee exit interviews, complaints about meetings, and allegations of unprofessional conduct during the new hire training session in December 2004, her beliefs are not support enough to survive summary judgment.  A plaintiff may not argue that an employer somehow used the wrong criteria to make its employment decisions.  "The focus is on the criteria identified by the employer, not the criteria only the plaintiff thinks are important." Simpson v. Kay Jewelers, 142 F.3d 639, 648 (3d Cir. 1998).  Indeed, conflict with staff is a legitimate reason to terminate employment. See, Palma v. Volunteers of America, 2006 U.S. Dist. LEXIS 5176, at

*17 (E.D. Pa. 2006) (holding that conflicts with other staff members constituted a legitimate reason for terminating an employee; refusing to consider the employee's allegation that her supervisor fabricated stories about her to justify her termination).

If an employer relies on statements and complaints by co-workers when making a decision to terminate an employee, the employee cannot later establish pretext by simply challenging the veracity of such statements.  So long as the decision-maker reasonably credited the allegations, an employee's denial is not enough to establish pretext.  See, Coulton v. University of Pennsylvania, 2006 U.S. Dist. LEXIS 12459, at *26 (E.D. Pa. 2006) ("Plaintiff is not entitled to an inference of discrimination because the University believed the allegations against him").

The plaintiff in Coulton, a white male, was employed in a laboratory at the University of Pennsylvania where he periodically acted as a supervisor.  The plaintiff reported experiencing problems with his staff members because the majority of employees in his department were African American.  Id. at *2.  A newly hired temporary employee informed management that the plaintiff was dropping live mice into garbage disposals rather than following the laboratory policy of humane euthanasia.  Id. at *5.  When managers approached the plaintiff about the allegations, much like Ms. McCormick, he did not explicitly deny the allegations or provide an explanation. Id. at *6.  After his termination due to the staff  allegations, the plaintiff asserted that he was the victim of racial discrimination.  The court held that the employer had articulated a legitimate, non-discriminatory reason for the plaintiff's termination.  The employer credited the allegations against the plaintiff because the plaintiff admitted he did not have a problem with his accuser, the accuser was a temporary employee with no reason to lie, and the plaintiff never sufficiently addressed the allegations.  Id. at 9.  The court granted summary judgment to the employer finding

29

that the university reasonably believed and relied on the allegations.  Id. at *30.

Like the employer in Coulton, AVS presented evidence that it relied on allegations made by independent witnesses: two new hires who had no reason to fabricate allegations against Ms. McCormick.  Here, unlike the plaintiff in Coulton, Ms. McCormick also had even been given a written disciplinary warning mere weeks before the alleged incident.  Finally, as in Coulton, AVS notes that it has "consistently explained that it received a report of unprofessional conduct by a newly hired employee, it investigated the allegations, the allegations were corroborated by an independent witness, and AVS terminated Plaintiff's employment based on its conclusions regarding the allegations."  (Def.'s Resp. to MSJ-P p.26.)  Taken in the light most favorable to Ms. McCormick, the evidence presented simply fails to establish for the purpose of summary judgment that AVS's proffered justifications for her termination are mere pretext.

**B.**     **Title VII/PHRA Retaliation**

Ms. McCormick maintains that she is entitled to summary judgment against AVS under Title VII because AVS retaliated against her for requesting FLMA maternity leave.  In order to make out a *prima facie* case of retaliation under Title VII, an employee must demonstrate that (1) she engaged in a protected activity as defined by the Act; (2) her employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link between the protected activity and the adverse employment action exists.  Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).

AVS asserts that Ms. McCormick cannot succeed in her retaliation claim under Title VII because she does not establish any purported protected activity in connection with her claim. The first prong of the test for Title VII retaliation requires Ms. McCormick to oppose a practice

made unlawful under the applicable statute.  <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694, 702 (3d Cir. 1995).  Although plaintiffs often satisfy this prong of the test by filing a formal complaint with the EEOC, a plaintiff *at the very least* must make an informal protest of discriminatory employment practice.  <u>Id.</u>  A simple request for maternity leave cannot satisfy the first prong of the test because it involves *no* protest (formal or informal) of an unlawful practice.  Therefore, such a request cannot constitute a statutorily protected activity for purposes of a Title VII retaliation claim.

Ms. McCormick merely requested maternity leave, which is neither participation in a Title VII proceeding nor an act in opposition of discrimination.  As AVS notes, there was no purported discriminatory conduct to oppose when Ms. McCormick requested her leave, a request which AVS granted.  Accordingly, Ms. McCormick has not identified any Title VII protected activity in which she engaged prior to her termination and, therefore, has not established a *prima facie* case of retaliation under Title VII or PHRA.

**C.      FLMA Retaliation**

**i.      Ms. McCormick Does Not Establish a *Prima Facie* Case of FLMA Retaliation**

Ms. McCormick argues that she has established a *prima facie* case of FLMA retaliation simply because she took FLMA leave and was fired at the end of her leave period.  In order to establish a *prima facie* claim for retaliation under the FLMA, though, a plaintiff must show that (1) she took an FLMA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave.  <u>Conoshenti v. Public Service Electric & Gas Co.</u>, 364 F.3d 135, 146 (3d Cir. 2004).  Ms. McCormick has established the first two prongs of

the test, so the Court must examine the third prong – the alleged causal link.  The main factors in determining a causal link between protected FLMA leave and termination are timing and a pattern of antagonism between the protected FMLA leave and the adverse employment action, though any number of additional factors may be considered as well.  Garabedian v. Lone Star Steakhouse & Saloon, 2007 U.S. Dist. LEXIS 44759, *6 (E.D. Pa. June 20, 2007).

Prior to Ms. McCormick's request for FLMA leave on October 29, 2004,[8] she had not been disciplined, and, in fact, had received a positive six-month performance review.  Four days after Ms. McCormick officially requested FLMA leave, Ms Menszak first discussed negative comments in long-term employees' exit interviews.  Over the following days, Ms. Bertino and Ms. Menszak prepared written notes referring to concerns voiced by staff members about Ms. McCormick.  On November 11, 2004, Ms. Menszak and Ms. Bertino presented Ms. McCormick with a two-page written warning.  The two managers testified in depositions that they considered terminating Ms. McCormick's employment at that time, but did not because she was near the end of a high risk pregnancy.  Pl.'s Reply in Support of MSJ-P at 12-13.

Ms. McCormick likens herself to the plaintiff in Robinson v. Southeastern Pa. Transportation Authority, 982 F.2d 892, 895 (3d Cir. 1993).[9]  The Robinson plaintiff complained

---

[8]Although Ms. McCormick did not officially request FLMA maternity leave until October 29, 2004, she informed her employer in April 2004 about her pregnancy and her intention to eventually request FLMA leave.

[9]Robinson examines a Title VII retaliation claim. However, Robinson provides useful analysis even for this FLMA retaliation claim because the test for a causal link between the protected activity and the adverse employment action is the same for both Title VII and FMLA retaliation claims.  Compare, Jalil v. Avdel Corp.,873 F.2d 701, 708 (3d Cir. 1988) (applying the three-prong test to a Title VII retaliation claim); Conoshenti, supra (applying the identical three-prong test to an FLMA retaliation claim).

about alleged racial discrimination, and, following his complaints, he was subject to multiple disciplinary actions and a "constant barrage of written and verbal warnings" which continued unabated until his discharge.  Id. at 895.  Ms. McCormick claims that AVS subjected her to unreasonable supervision and attempted to invoke her subordination, but even considered in the light most favorable to Ms. McCormick, the facts establish that managers were simply responding to complaints from staff members.  Also, while managers did contact Ms. McCormick about disciplinary matters almost immediately after she requested leave, they did not contact her during that leave until the day before she was to return to work.  This does not rise to the level of the unabated, constant harassment the Robinson plaintiff faced.

Ms. McCormick cites Garabedian v. Lone Star Steakhouse & Saloon, 2007 U.S. Dist. LEXIS 44759 (E.D. Pa. June 20, 2007), for additional support to link her FLMA leave and eventual termination.  Again, the facts presented in that case do not match the facts surrounding Ms. McCormick's situation.  In Garabedian, the plaintiff received multiple written and verbal warnings his first week back from leave.  During the four days prior to his termination, he received at least one written warning each day.  The plaintiff had evidence that he was subjected to closer supervision and scrutiny than other managers, as the regional manager visited his restaurant more times the weeks following his leave than at any time prior to his leave period or following his termination.  Id. at *9-10.  Here, Ms. McCormick has introduced no evidence that she was subject to greater scrutiny than other AVS managers or that she received so many warnings as to constitute harassment in its own right.

While Ms. McCormick's written warning certainly occurred close to the date she requested FLMA leave, one disciplinary event, i.e., the receipt of written discipline, does not

constitute harassment or antagonism. Ms. McCormick cites the discussions her managers had with each other prior to writing the letter as evidence of antagonism. However, she was not privy to such conversations until after receiving her written warning. Thus, these discussions cannot be considered harassment of Ms. McCormick inasmuch as she was unaware of them at the time they occurred and they were not directed <u>at</u> her at the time.

Although Ms. McCormick cannot describe her situation to match those of the plaintiffs in Robinson or Garabedian, she argues that the short time period between her request for leave and her receipt of the written discipline still establishes a sufficient inference of a causal link to survive summary judgment. The Third Circuit Court of Appeals has noted that its "case law is 'seemingly split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a *prima facie* case of retaliation." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). The court cautioned that any split was not an inconsistency in analysis, but rather was fact-based. Different rulings result from the temporal proximity between the activity and the alleged retaliation, as well as the specific context in which events occur. Id.

While a short period of time between FLMA leave (or a request for leave) and an adverse employment action is not itself sufficient to establish a causal link in a vacuum, such an abbreviated time period factors heavily into the causal inference. <u>Garabedian</u>, 2007 U.S. Dist. LEXIS 44759 at *8 ("[a] short period of time...factors into the causal inference") (citing <u>Fasold v. Justice</u>, 409 F.3d 178, 189-90 (3d Cir. 2005) (discussing a period less than one month and noting that "a short period of time" may provide the evidentiary basis of an inference of retaliation)); <u>Zelinski v. State Police</u>, 108 Fed. Appx. 700, 706 (3d Cir. 2004) (stating two months is "much

more 'unusually suggestive' than a period of ten months); <u>Silvestre v. Sere Care, Inc.</u>, 2000 U.S.

Dis. LEXIS 25267 *26 (E.D. Pa. Dec. 30, 2002) (noting that two months "appears to be a

relatively short time" between the protected activity and adverse action).

Ms. McCormick asks the Court to find that the 13 *days* between her request for leave and

her receipt of the written warning are so "unusually suggestive" as to establish causation without

more.  In <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701 (3d Cir. 1989), the court reversed the grant of

summary judgment in favor of the defendant because the plaintiff had established causation

simply by showing that he was discharged two days after his employer received notice of his

EEOC claim.  <u>Id.</u> at 708.  In this case, though, the actual time frame is much broader.  In April

2004, Ms. McCormick informed AVS management of her pregnancy and her intention to take

FLMA leave.  While she did not officially request the leave until 13 days before receiving written

discipline, AVS was aware of both her pregnancy and her intention to take FLMA leave for *seven*

*months* before she received the written warning.  The organization's long-term knowledge of her

situation renders lame Ms. McCormick's argument that temporal proximity alone is enough to

establish the necessary causal link.  Ms. McCormick has failed to establish a *prima facie* case of

FLMA retaliation.

ii.     **Even if Ms. McCormick Demonstrated a *Prima Facie* Case of Retaliation, She Does
        Not Present Evidence that Defendant's Legitimate, Non-Discriminatory Reasons for
        Terminating Her Employment Are Mere Pretext**

Even if Ms. McCormick had established a *prima facie* case of FLMA retaliation for

purposes of summary judgment, she failed to provide evidence that the reasons AVS proffered for

her termination[10] were mere pretext.

    The fact that Ms. McCormick was fired the day before she was scheduled to return from maternity leave, in itself, is not conclusive proof of pretext.  In <u>Holmes v. Pizza Hut of America, Inc.</u>, 1998 U.S. Dist. LEXIS 13787 (E.D. Pa. 1998), the court granted summary judgment for an employer that terminated the plaintiff while she was on FLMA leave.  The termination came about because of an internal investigation that took place during the employee's leave period, much like that in the case at issue.  The court in <u>Holmes</u> found that the plaintiff had failed to show that her employer's proffered reasons for her termination were mere pretext.  Also, the court found that the plaintiff would have been terminated regardless of whether she had taken leave.  <u>Id.</u> at *21.  The court in <u>Holpp v. Integrated Communications Corp.</u>, 214 Fed. Appx. 176 (3d Cir. 2007), came to the same conclusion after considering the termination of an employee the day she returned to work where termination was the result of ongoing customer complaints.  <u>Id.</u> at *6.

    Ms. McCormick's claim of FLMA retaliation is subject to the same pretext analysis as her claims of sex and pregnancy discrimination.  <u>Gventer v. Theraphysics Partners of Western Pennsylvania, Inc.</u>, 41 Fed. Appx. 552, 553 (3d Cir. 2002).  <u>See</u>, <u>*supra*</u> § III.A.ii.  Under the FLMA, "an employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FLMA leave period."  29 C.F.R. § 825.216(a).  Because Ms. McCormick failed to establish pretext under her claims of sex and pregnancy discrimination, she fails to establish it for purposes of the retaliation claim as well.

---

[10]<u>See</u>, <u>*supra*</u> §III.A.ii.

**IV. CONCLUSION**

Although Ms. McCormick has presented sufficient evidence to state a *prima facie* case of sex and pregnancy discrimination under Title VII, there is insufficient evidence in the record for her to carry her burden to demonstrate that the proffered reasons for her discharge are mere pretext. Even when viewed in the light most favorable to Ms. McCormick, the evidence does not support a conclusion that the proffered reasons were fabricated or an inference that discrimination was more likely than not a motivating cause of her discharge. In addition, Ms. McCormick has adduced insufficient evidence to assert a *prima facie* case of either her Title VII retaliation or her FLMA retaliation.

For the reasons set forth above, Ms. McCormick's Motion for Summary Judgment is denied in its entirety. AVS's Motion is granted. An appropriate Order consistent with this Memorandum follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KELLEY A. MCCORMICK,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **ALLEGHENY VALLEY SCHOOL,** | : | |
| **Defendant.** | : | **No. 06-3332** |

## ORDER

    **AND NOW,** this 4th day of February 2008, upon consideration of Defendant's Motion for

Summary Judgment (Docket No. 41), Plaintiff's Motion for Summary Judgment (Docket No.42),

Plaintiff's Response in Opposition (Docket No. 45), Defendant's Response in Opposition (Docket

No. 46), Defendant's Response in Support (Docket No. 49), Plaintiff's Reply (Docket No. 50) and

Plaintiff's Response (Docket No. 51), **IT IS HEREBY ORDERED** that Plaintiff's Motion is

**DENIED**, and Defendant's Motion is **GRANTED**.


                                BY THE COURT:


                                S/Gene E.K. Pratter
                                GENE E.K. PRATTER
                                UNITED STATES DISTRICT JUDGE